[Crim. No. 13999. Second Dist., Div. Four. Nov. 13, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD MORRIS STEWART, Defendant and Appellant.

368

Patrick J. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Phillip G. Samovar, Deputy District Attorney, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant and Ernest King were jointly charged with murder in violation of section 187 of the Penal Code. On motion of both defendants, the cases were severed.[1] Defendant pled not guilty. After a trial by jury, he was found guilty of murder in the first degree, the jury fixing the penalty at life imprisonment. A motion for new trial was denied; probation was denied; defendant was sentenced (pursuant to the jury's verdict) to imprisonment for life. He has appealed from the judgment.

On November 10, 1966, at about 8 p.m., Frances Herndon, Ernest King and defendant were at Gene's Tavern. All of them left Gene's Tavern and went to the Cozy Bar where they stayed for four hours. They then went to the Seven-O Club. Defendant and King were talking to a man wearing a red jacket and Herndon saw King leave the bar with the man in the red jacket. In five or ten minutes defendant came running back and gave Herndon $100, telling Herndon to give the money to King. Defendant left.

On November 10, Charles Richards, the deceased, was wearing a red jacket. At 8:15 p.m. the deceased did not have any noticeable abrasions.

Rue Romero, who was at the Seven-O Club, was told by King that he would "fix him up" with a girl. When King left the Seven-O Club Romero followed him out. Romero saw King go around the corner. Romero got into his Thunderbird and while driving his car he saw King standing in front of 720 New York Street. King got in Romero's car. King told Romero where to drive and King said, "Hey, there is my buddy. Can you pick him up?" Defendant got into Romero's car in McDonald's Drive-In. Romero saw a red police light and heard a siren, so he pulled over.

At about 12:30 a.m. David Sanders was on his way home. He saw defendant approach 620 New York Street and look down the center of the apartment building. A few minutes later defendant ran out of the apartment building and Sanders heard a man cry for help. King also came running out of the apartment area. Sanders saw King talking to Romero and saw defendant run around the corner. Sanders followed defendant into the Seven-O Club where he saw defendant

---

[1] Only the conviction of defendant Stewart is presently before us.

counting out money. Defendant told a lady in the bar that he would be back and he left. Sanders followed defendant outside and saw defendant get into Romero's car.

Officers Miller and Hamilton were in the vicinity of the Seven-O Club when they saw a man running down the street. Officer Miller was suspicious because the person running looked back and then began walking. It is a high crime rate area and the night before Officer Miller made out an assault with a deadly weapon report. The officers pulled into the driveway to wait for defendant. Defendant got in the back of Romero's Thunderbird and the officers pulled into McDonald's Drive-In behind the Thunderbird. Defendant was turned sideways to the right side of the vehicle with his arm working in a downward motion and Officer Hamilton thought defendant was trying to conceal something between the cushions. Officer Miller went over to the Thunderbird where he again observed defendant turned sideways and his arms were in a downward position between the seat and side panel. The officers ordered King, Romero and defendant out of the vehicle and asked them for identification, to whom the car belonged, and for the registration of the vehicle. Defendant told Officer Hamilton that he had not hidden anything between the cushion and the car seat, and Romero gave Officer Hamilton permission to search the car. After the officer determined that the car belonged to Romero, Officer Hamilton found money (totalling $89) sticking out of the back seat where defendant had made the motions with his arms. Officer Hamilton had actually seen the money sticking out of the cushion before the search.

David Sanders, a witness for the People, motioned Officer Miller over and the police accompanied Sanders to 620 New York Street and found the deceased between the apartments. A knife, which belonged to the victim, was found near a trash barrel. The deceased's wallet was missing. Officer Miller received a call to hold the suspects as there was a possible homicide at 620 New York Street. Defendant, King and Romero were placed under arrest.

Without being asked a question defendant volunteered, ''I have been in the bar drinking all night. You are going to have to prove it was me, baby.''

During the booking procedure defendant voluntarily stated to Officer Knoch, ''I really made the big time this time. Maybe I will get the pill. I guess it happens every time you kill somebody.''

Officer Vogel heard King say to defendant at the police station, "How come you told Vogel that I stabbed the guy?" Officer Vogel interrupted and said, "Just a moment. Stewart didn't say that you stabbed the victim. He said that he saw you fighting with the victim. He never did say that he saw you stab him." King said, "Oh, yeah, that's right." King later said to defendant, "I wish Governor Brown was still in office." Defendant said, "Yeah, I'll see you in the gas chamber." King and defendant told the officers that Romero and Herndon were not involved. Some of the officers testified that defendant was not intoxicated.

Numerous abrasions were found on the victim's face, a stab wound penetrated the heart, and there was a wound in the chest near the shoulder and neck. The victim had cashed a payroll check the night before. Several witnesses testified that defendant was intoxicated and Lewis testified that defendant had staggered and that he fell down. Defendant said that after leaving the apartment he was in he looked in the New York apartment and he saw two men tussling. Defendant picked up a wallet, took the money, and ran and threw the wallet in the street. Defendant denied making statements to the booking officer.

I

Except for certain statements by defendant and his codefendant King, the evidence against defendant was purely circumstantial. It indicated that he and King had left a bar with, or immediately after, the victim, Richards; that defendant, who had been without funds theretofore, suddenly appeared carrying a substantial quantity of money; that the victim, who had cashed a pay check shortly before, was found in a nearby alley, dead from knife wounds[2] and with his wallet missing; that defendant and King engaged in suspicious conduct, resulting in their arrest. There was substantial, although conflicting evidence that defendant was highly intoxicated. There was, also, evidence (admitted out of the presence of the jury on the issue of defendant's waiver of his *Miranda* rights) that he was of low grade intelligence, being in the "moron" range.

While the People's theory, as ultimately argued to the jury, was that defendant was guilty, either as the killer or as a statutory principal, of a felony murder—*i.e.*, a death in the

---

[2]Richards' own knife, which fitted at least some of the wounds, was found near his body. We discuss, later, a contention involving the possibility of a second knife.

perpetration of robbery—the circumstantial nature of the evidence left open at least four possibilities: (1) that Richards was killed intentionally as a step toward taking his money;[3] (2) that he was killed accidentally, as an unintended result of an assault committed for the purpose of robbing him; (3) that he was killed—intentionally or accidentally—by King or by defendant, for some reason disconnected with robbery, and that the taking of his money was an independent afterthought; (4) that Richards was killed by someone not connected with King or defendant, but his wallet was taken by defendant as a wholly independent act.[4]

These possible inferences from the evidence were all matters that the trial court was required to submit to the jury by proper instructions. Clearly, also, these possibilities involved the submission to the jury of a variety of subordinate issues, all relating to the presence or absence of the variety of intents involved under each possible theory of guilt.

We have read the instructions as given. We find that one instruction—an attempted definition of second degree murder —was erroneous on any theory; we find that the instructions on felony murder were erroneous because of the omission of one essential element. Consequently we reverse the judgment.

## II

The trial court gave an instruction on second degree murder. In so doing, it made its own re-revision of the printed form of CALJIC No. 305 (revised). We set forth a copy of the instruction, as so re-revised, as it appears in the clerk's transcript before us: [See next page.]

Quite apart from any objections to the instruction in its original and printed form, it is clear that, with the deletions and interlineations made by the trial court, it was inaccurate and confusing. As given, it starts by telling the jury (erroneously) that murder in the second degree involves a killing

---

[3]Counsel argues to us that an instruction on this theory was erroneous, because the People, in argument, had relied on the second—*i.e.*, accidental felony murder—theory. While it is error to instruct on a theory not supported by evidence (*People* v. *Anderson* (1965) 63 Cal.2d 351, 360 [46 Cal.Rptr. 763, 406 P.2d 43]), it is the right of the trial court to instruct, even on its own motion, on all theories raised by the evidence; the fact that counsel chooses to espouse one particular theory does not require the trial court to ignore other possible theories of the case. (*People* v. *Phillips* (1966) 64 Cal.2d 574, 580-581, fn. 4 [51 Cal.Rptr. 225, 414 P.2d 353].)

[4]This was the theory of the defense, as set forth in defendant's testimony. Obviously, the jury did not accept it.

11.

305. (Revised)
MURDER OF THE SECOND DEGREE

-17

Murder of the second degree is the unlawful killing of a human being with malice aforethought ~~which is not perpetrated by means of poison or lying in wait, or torture; or~~ on any one ~~by any other~~ kind of wilful, deliberate, and premeditated killing, and which is not committed in the perpetration or attempt to perpetrate ~~arson, rape,~~ robbery, ~~burglary, mayhem, or any act punishable under section 288 of the Penal Code.~~

In practical application this means that the unlawful killing of a human being with malice aforethough is murder of the second degree in any of the following cases:

(1) When there is manifested an intention unlawfully to kill a human being but the evidence in insufficient to establish wilfulness, deliberation and premeditation, or

(2) When the killing results from an act involving a high degree of probability that it will result in death, which act is done for a base. antisocial motive and with wanton disregard for human life, or

(3) ~~When the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life, such as...~~

.........................

| HISTORY of this instruction shown by check (V) marks | |
|---|---|
| Requested by People | |
| Requested by Defendant | |
| Given on Court's Motion | ✓ |
| Given as Requested | |
| Given as Modified | |
| Refused | |

Instruction numbers, captions and notes are not parts of the respective instructions, and have not been read to the jury.

Beach Vasen
Jud :

that is "wilful, deliberate and premeditated," and then, in the next paragraph, tells the jury the exact opposite. What a jury might have made of this juxtaposition of opposites we cannot know. Since the state of defendant's mind and his intent was a major issue, the instruction, as given, could not have been other than prejudicial.

Secondly, the instruction as printed, even had it been given in that form, standing alone as it did, was insufficient to guide the jury. As we have pointed out above, one possible theory of the case was that Richards was killed intentionally as a preliminary step in the robbery. But, in the face of the strong evidence of his intoxicated condition,[5] *People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959], *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492], and *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53], required that the jury be told, in the language adopted in *Wolff*, that defendant could not be convicted of any intentional killing[6] of a degree higher than second degree murder if, as a result of his diminished ability to reason, he was unable "maturely and meaningfully [to] reflect upon the gravity of his contemplated act." No such instruction was given. Its omission was prejudicially erroneous.

Thirdly, it is now clear, in view of *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911], that the jury should have been instructed to consider, in the light of the evidence as to his intoxication (and we assume on a retrial the evidence of his low intelligence) whether or not he was capable of forming that "malice" which distinguished murder from manslaughter and that an instruction, on the general lines of that suggested in *Conley*[7] should also have been given.[8]

---

[5]The evidence of defendant's limited mental capacity was offered for a limited purpose only, and was not before the jury. Hence at the trial below, reference to the concept of diminished mental capacity would only have been confusing. However, we must assume that, since the case must be retried for other reasons, counsel will there be alert to offer such evidence as part of the defense. Accordingly, although the trial court was not in error in omitting reference to that concept, it seems desirable to point out the duty of the court on a retrial with the evidence officially before it.

[6]The instruction, of course, should also make it clear that neither the *Wolff* nor the *Conley* concept was applicable if the jury adopted the alternative theory of a killing amounting to felony murder.

[7]*People* v. *Conley* (1966) 64 Cal.2d 310, 324-326, fn. 4 [49 Cal.Rptr. 815, 411 P.2d 911].

[8]The Attorney General relies on *People* v. *Sievers* (1967) 255 Cal. App.2d 34, 38-39 [62 Cal.Rptr. 841], as authority for the proposition that this omission, if error, was nonprejudicial. But in *Sievers* the trial

## III

■ The trial court, in addition to the instructions above discussed on the theory of an intentional killing, also instructed on the prosecution's theory of a felony murder. After quoting the pertinent portion of section 189 of the Penal Code,[9] the trial court instructed as follows:

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which is committed in the perpetration or attempt to perpetrate robbery, the commission of which crime itself must be proved beyond a reasonable doubt, is murder of the first degree.

"For a defendant to be guilty under the felony murder rule, the act of killing must be committed by the defendant or by his accomplice acting in furtherance of this common design."[10]

"The law requires that a defendant to be found guilty of murder in the first degree under the felony murder rule that the prosecution prove beyond a reasonable doubt that there was a specific intent on the part of the defendant to commit the particular felony, in this case robbery, and that the prosecution prove beyond a reasonable doubt the elements of the particular felony."

"In the case of certain crimes, it is necessary that in addition to the intended act which characterized the offense, the act must be accompanied by a specific or particular intent without which such a crime may not be committed."[11]

"In a crime such as that of which defendant is charged in the information, there must exist a union or joint operation of act or conduct and a certain specific intent.

"In the crime of robbery murder, there must exist in the mind of the perpetrator the specific intent to commit robbery, and unless such intent so exists that crime is not committed."[12]

However, although the court purported to define robbery for the jury, that instruction was incomplete. The sole definition given to the jury was as follows: "Robbery is the feloni-

court had instructed on the effect of diminished capacity in general; the appellate court held only that, under those circumstances, it was not prejudicial to fail to single out intoxication as one type of diminished capacity. In the case at bench, no instruction of any kind in the area of diminished capacity was given.

[9]The court gave CALJIC 302-A (revised) with appropriate deletions.
[10]CALJIC 302-F (Revised).
[11]CALJIC 72-B (Modified).
[12]CALJIC 71.11 (new).

ous taking of personal property of any value in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.'' At no time did the trial court instruct the jury as to the meaning of the term ''felonious taking'' as used in the definition read to them. But that omission was error. The jury must, in addition to the statutory definition of robbery, also be told that a felonious taking involves the specific intent to steal—*i.e.,* the intent permanently to deprive an owner of his property. (*People* v. *Nichols* (1967) 255 Cal.App.2d 217, 223 [62 Cal. Rptr. 854].)

Admitting that this omission was error the Attorney General argues that it was nonprejudicial. He relies on *People* v. *Ford* (1964) 60 Cal.2d 772, 793 [36 Cal.Rptr. 620, 388 P.2d 892]. But in that case the intent with which the property was taken was not in issue. In the case at bench, as in *People* v. *Garcia* (1959) 169 Cal.App.2d 368 [337 P.2d 100], the evidence of defendant's intoxication put his intent in issue. The trial court recognized that fact to a limited extent, and did instruct the jury in the following terms: ''In the crime of murder in the perpetration of robbery of which defendant is accused, [~~in count~~ . . . . of the information], a necessary element is the existence in the mind of the defendant of the specific intent to commit robbery. If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific intent.'' But that instruction, correct as far as it went, did not cure the other omission, since it did not direct the jury's attention to the particular intent—*i.e.,* the intent to steal as above defined —which the intoxication might have affected. We need not decide whether or not the omission was here prejudicial since the case must be reversed on other grounds.

## IV

Since the judgment must be reversed for the errors already noted, we consider further only those contentions that involve matters likely to arise on a retrial.

## A

Defendant asserts that his rights under *Miranda*[13] were

---

[13]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

violated by the admission into evidence of certain statements made by him to the police.[14]

He objects to the receipt of his statement to the officer that he had not hidden anything between the cushions, which was made in response to the officer's question as to whether defendant had hidden anything between the cushions. Defendant's rights were not violated. At the time of this question and answer the police were making a preliminary investigation and defendant was not yet in custody.

Defendant also contends that his statement that he was in a bar drinking all night was in response to an accusation that he was involved in a murder and robbery and was error. Defendant's statement was made without any prior question being asked by the officer. Volunteered statements are not barred by *Miranda*. This is also true of defendant's statement that Romero was not involved in the crime. Defendant had asked the police a question and the police answered it when defendant voluntarily made his statement concerning Romero.[15]

Defendant also argues that certain remarks he made to King to the effect that King should not say anything further shows that defendant himself did not wish to say any more, and that defendant was exercising his right to desist from speaking under *Miranda*. Defendant's remarks to King

---

[14]As we have indicated above, the trial court conducted an extensive inquiry, out of the presence of the jury, as to defendant's mental capacity. As a result of that hearing, the court held that defendant had lacked the mental capacity to understand the warnings given to him and, thus, that his apparent waiver of his *Miranda* rights was not lawfully made. No contention as to mental capacity seems, however, to have been urged at the trial as to the statements considered in the text.

[15]"And then my partner advised him again, King, that is, that he, [Condino] too, was still in jail.

"King stated, 'Tony didn't have nothing to do with it.'

"Q Referring to Tony Condino?

"A Yes, sir.

"And then King said, 'Yeah, that's right.'

"And then he asked also about another man.

"Q Who asked?

"A King. King asked about another man, a Mexican lad that was arrested, too, whose name I don't recall right now, and asked if he was still in jail.

"And my partner told him that he was, too.

"I asked King at this time if he were involved in the matter.

"And he said, King said, 'No, he is not.'

"Stewart at this point said, 'Who do you mean?'

"And my partner said, 'The Mexican fellow that was arrested, the one you got in the car with,' to Stewart.

"Stewart said, 'Oh, no,' he says, 'he is not involved.' He says, 'He doesn't know nothing about it.'"

mean nothing of the sort; perhaps defendant wanted King to say no more because defendant believed that King might make their situation worse by speaking, while defendant, speaking alone, believed he might improve his situation.

■ Defendant argues that his *Miranda* warnings were inadequate in that he was not told that he had the right to an attorney during the interrogation.[16] The court in *People* v. *Bolinski* (1968) 260 Cal.App.2d 705, 723 [67 Cal.Rptr. 347], held that a statement advising that the public defender would be appointed by the court is not the equivalent of an advisement that counsel would be provided to be present at the interrogation, although defendant Bolinski was also told he could have an attorney at any time during any interview. Thus the admonition in the *Bolinski* case and the case before us was inadequate.

It is argued that the statement that defendant might have his attorney ''here'' distinguishes *Bolinski* and satisfies *Miranda*. We do not agree. The burden is on the People to show that warnings of all the constitutional rights were given, that defendant understood them, and that he thereafter voluntarily and intelligently waived those rights. Ambiguities in the warnings must be resolved against the prosecution. As recounted in the case at bench, the warning could well have been interpreted to mean no more than that the court-appointed attorney would, at some future time, visit defendant in jail. This is not the equivalent of telling him that the interrogation would suspend until the attorney arrived.

### B

■ Defendant claims that there was an improper delay in arraignment, and wishes this court to take judicial notice of that fact. On appeal from a judgment of conviction defendant cannot take advantage of any failure to promptly bring him before a magistrate for arraignment, even if the failure is reported in the record, where defendant has not raised the issue in the trial below. (*People* v. *Thomas* (1966) 246 Cal.

---

[16]The admonitions given to defendant were:
''. . . that he had a right to remain silent, not say anything at all; that he had a right to an attorney, and he could have his attorney here; and that he didn't need to say anything; that if he did say anything, it would be used in court against him.

''And I told him that besides these rights, he had additional rights.

''Q What additional rights did you tell him about?

''A He had a right to have the Public Defender appointed in case he couldn't afford an attorney; and that if he didn't want the Public Defender to be appointed, that he could pick an attorney and this attorney would be appointed by the Court for him.''

App.2d 104 [54 Cal.Rptr. 409]; *People* v. *Northrup* (1962) 203 Cal.App.2d 470 [21 Cal.Rptr. 448].) And even assuming that that was an unnecessary delay in a violation of defendant's right to be taken before a magistrate it does not require a reversal unless defendant shows that the conduct deprived him of a fair trial or he suffered prejudice. (*People* v. *Hill* (1967) 66 Cal.2d 536, 550 [58 Cal.Rptr. 340, 426 P.2d 908]; *People* v. *Boone* (1967) 252 Cal.App.2d 313 [60 Cal. Rptr. 275].)

### C

Defendant asserts that the district attorney's remarks concerning the possibility of two knives being used in the murder were incredible and conjectural and were prejudicial error. One witness, Dr. Chapman, had testified that the fourth wound, the one at the top of the neck, did not have the same entry dimensions as the other three wounds. In the prosecutor's argument to the jury any reasonable inference may be drawn from the evidence and it is a matter within the discretion of the trial court to determine whether counsel stays within the permissible range. (*People* v. *Jones* (1962) 200 Cal.App.2d 805, 810 [19 Cal.Rptr. 787].)

### D

 Defendant argues that certain photographs of the victim, one of which showed abrasions on his face, were inflammatory. One of the other objected-to photographs showed the victim in a red jacket and the other showed the victim in the position he was in when Mr. Sanders found him. In *People* v. *Darling* (1962) 58 Cal.2d 15, 21 [22 Cal.Rptr. 484, 372 P.2d 316], pictures of a head and neck with bullet wounds were held not gruesome, and in *People* v. *Love* (1960) 53 Cal.2d 843, 852 [3 Cal.Rptr. 665, 350 P.2d 705], pictures of a nude body with a hole in the back and quantities of blood have been held not gruesome. When allegedly gruesome photos are presented the trial court must weigh their probative value against their prejudicial effect. (*People* v. *Love, supra* (1960) 53 Cal.2d 843.) The photographs in the instant case clearly had probative value and there was no error.

### E

 The search and seizure was also proper. In the instant case, in addition to defendant's furtive movements with his hands in pushing something into the car seat, the officer actually saw the money sticking out of the cushions

before he made a search and he was also given permission to search the car by the owner. There was more than sufficient cause for the search.

F

Defendant argues that it was improper for the court to inquire into prospective jurors' thoughts on capital punishment and to dismiss a juror for her disbelief in the death penalty. Defendant's argument that people without conscientious scruples against the death penalty tend to be authoritarian personalities and therefore favorable to the prosecution's case has already been answered by the case of *People* v. *Gonzales* (1967) 66 Cal.2d 482, 497 [58 Cal.Rptr. 361, 426 P.2d 929]. That case, insofar at least as it applies to a case in which the death penalty was not imposed, so that only the effect on the finding of guilt is involved, is still the law of California. In *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], the United States Supreme Court reversed a judgment of death because jurors opposed to the death penalty had been improperly excluded from the jury.[17] But the Supreme Court restricted its relief to a reversal of the penalty and expressly rejected the contention—the same as made here—that the exclusion affected the validity of the determination of guilt.[18]

The judgment is reversed.

Files, P. J., and Jefferson, J., concurred.

---

[17]Since the death penalty cannot be imposed on a retrial (*People* v. *Henderson* (1963). 60 Cal.2d 482 [35 Cal.Rptr. 77, 386 P.2d 677]), we need not here determine whether the procedure used at this trial violated the *Witherspoon* rule.

[18]"The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a per se constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was." (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 782, 88 S.Ct. 1770].)