[Crim. No. 13136. In Bank. Nov. 14, 1969.]

In re DARRYL THOMAS KEMP on Habeas Corpus.

**COUNSEL**

Marshall, Busby & Clark and Dwain Clark for Petitioner.

Thomas C. Lynch, Attorney General, John T. Murphy and Horace Wheatley, Deputy Attorneys General, for Respondent.

**OPINION**

**PETERS, J.**—Darryl Thomas Kemp, under sentence of death for murder, petitions for a writ of habeas corpus. The writ must be granted as to the penalty under the rules announced in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], but denied insofar as the petition seeks to attack the judgment of guilt.

Petitioner was convicted after a jury trial of one count of murder of the first degree, two counts of rape, and one count of kidnaping. He was found by the jury to have been sane at the time of the commission of each of the offenses charged, and the jury in January 1960 fixed the penalty for the murder at death. This court affirmed the judgments in *People* v. *Kemp*, 55 Cal.2d 458 [11 Cal.Rptr. 361, 359 P.2d 913], in March 1961.[1]

Petitioner alleges that the jury which sentenced him to death was selected in violation of the requirements of *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, and *In re Anderson,* 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117]. ■ *Witherspoon* established that in a capital punishment case, only those jurors who make it "unmistakably clear . . . . that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial," may be properly excluded. (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770].)

---

[1]While Kemp was awaiting execution, in September 1961, a sanity hearing was held before a jury pursuant to section 3701 of the Penal Code, which resulted in an order determining that Kemp was insane and committing him to the Department of Mental Hygiene. On February 19, 1969, Kemp, having been found to be now sane, was returned to San Quentin for execution of the judgment of death. We stayed Kemp's execution pending our decision on this petition.

After Kemp's petition was lodged with this court, an order was issued by the Superior Court of Marin County to the warden at San Quentin, to produce Kemp for the purpose of a sanity hearing. We have been informed that that proceeding is still pending in the trial court. The pendency of that proceeding has no legal effect on this proceeding. Even if found to be insane in that case, he should be able to test the validity of his conviction and not be forced to remain in a mental institution under threat of a judgment imposing the death penalty. (Cf. *In re Smiley,* 66 Cal.2d 606, 613 [58 Cal.Rptr. 579, 427 P.2d 179]; *In re Cain,* 243 Cal.App.2d 768, 771 [52 Cal.Rptr. 860].)

■ The Attorney General properly and with commendable candor concedes that at least 10 of the 12 jurors who were excluded based on their views concerning the death penalty were, under *Witherspoon,* improperly excluded.[2] The judgment imposing the death penalty must, therefore, be reversed. In the circumstances, it is unnecessary to consider whether the two additional jurors were properly excluded.[3]

---

[2]Six jurors were excused after responding to the following question from the trial court: "Now I want to ask this one question. Do any of you have any conscientious objection to finding the death penalty in a proper case? If so, I would like to have you raise your hands at this time and this includes all of you in the audience as well. If you folks would come forward, please, and give your name.

"Let the record show that six jurors are excused by the Court."

The following jurors were excluded after being questioned individually:

(1) Juror—Mrs. Frances Schrier.

"[The Prosecutor]: . . . [W]hen general questions were asked of the members of this prospective jury panel as a whole body whether or not they had any conscientious scruples against capital punishment, you started to raise your hand : . . .

"THE JUROR: . . . I don't know whether I would or whether I could, you know, to say to put someone to death. I don't think that I could. I don't think that I could.

"THE COURT: Well, if there is any question at all in your mind.

"THE JUROR: I don't think that I could.

"THE COURT: I will excuse the juror."

(2) Juror—Mrs. Beatrice Ehrman.

"THE JUROR: I don't believe, sir, in circumstantial evidence.

"[The Prosecutor]: You don't feel that you could return a verdict based on circumstantial evidence?

"THE JUROR: Well, if I found him guilty, I don't believe it would be fair and then, too, I do not live too far from the Los Feliz district. I thought I might not be suitable, . . .

"[The Prosecutor]: Well, you could return a death sentence based on circumstantial evidence?

"THE JUROR: Well, if, well, a great deal depended on the evidence.

"THE COURT: Well, if there is any question at all in this juror's mind, she should be excused."

(3) Juror—Mrs. Laurette M. Stuckey.

"THE JUROR: I am beginning to think it would be very difficult for me to render a death penalty.

"[The Prosecutor]: Well, does the Court wish to go into this?

"THE COURT: I am sorry, I didn't hear the answer.

"[The Prosecutor]: She said she thought it would be very difficult for her to render a death penalty.

"THE COURT: Well, if there is any question in the juror's mind, she should be excused. . . . Mrs. Stuckey will be excused by the Court."

(4) Juror—Mrs. Afton M. Raile.

"THE COURT: Did you hear the questions I asked the other jurors?

"THE JUROR: Yes, I did.

"THE COURT: Would your answers to those questions be the same?

"THE JUROR: Well, actually, your Honor, I have a doubt now. I don't believe that I could bring in the extreme penalty.

"THE COURT: All right, you may be excused."

[3]Juror—Mrs. Astrid M. Petersen.

"MRS. PETERSEN: May I make a statement, your Honor? When I came home and on the TV saw this man's picture I just knew I just couldn't sign a death warrant so maybe I should be excused.

"THE COURT: You wouldn't be required to sign any death warrant, but if you have

 Petitioner also attacks the judgment of guilt. He contends that, although this court in affirming his conviction of first degree murder rejected his contention that he lacked the mental capacity to commit the charged crimes (see *People* v. *Kemp, supra,* 55 Cal.2d 458, 470), cases subsequent to *Kemp* have changed the substantive law of diminished capacity, and under current law, the evidence is insufficient to sustain a finding that Kemp was capable of the specific intent required for the crimes involved. The contention is without merit.

Kemp's chief defense at his trial, diminished capacity, was held applicable to the guilt trial long prior to the *Kemp* trial in *People* v. *Wells,* 33 Cal.2d 330, 356-357 [202 P.2d 53], and *People* v. *Gorshen,* 51 Cal.2d 716, 726, 733 [336 P.2d 492]. After the judgment against Kemp was affirmed, we held in *People* v. *Wolff,* 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959], that "in the proceeding to determine the degree of the offense, the true test must include consideration of the somewhat limited extent to which this defendant could *maturely and meaningfully reflect* upon the gravity of his contemplated act." *Wolff* was followed by *People* v. *Bassett,* 69 Cal.2d 122, 140 [70 Cal.Rptr. 193, 443 P.2d 777], *People* v. *Goedecke,* 65 Cal.2d 850, 857 [56 Cal.Rptr. 625, 423 P.2d 777], and *People* v. *Nicolaus,* 65 Cal.2d 866, 878 [56 Cal.Rptr. 635, 423 P.2d 787]. Neither *Wolff* nor the cases following it, however, purported to establish a new standard of diminished capacity; rather, *Wolff* merely made clear that the determination of premeditation[4] requires " 'an appraisal which involves something more than the ascertainment of objective facts.' " (61 Cal.2d at p. 820.) Indeed, the language of the test in *Wolff* on which petitioner relies derives directly from concepts of premeditation developed in the earlier cases of *People* v. *Thomas,* 25 Cal.2d 880, 900 [156 P.2d 7], and *People* v. *Holt,* 25 Cal.2d 59, 89-90 [153 P.2d 21] (discussed in *Wolff,* at pp. 820-822).

---

some apprehension about voting for the death penalty in a proper case I will excuse you.

"MRS. PETERSEN: I feel I couldn't do it if I was asked to."

Juror—Mrs. Jewel I. Peterson.

"THE COURT: . . . I think we all realize that the imposition of a death penalty is a difficult, arduous, serious task. Do you feel that it would be impossible for you to do that, it being the law of the state under some circumstances, that such a penalty could be imposed?

"THE JUROR: I am afraid so.

"THE COURT: I will excuse the juror."

[4] It is not challenged that the concepts clarified in *Wolff, Goedecke,* and *Nicolaus,* all of which involved first degree murder based on premeditation, apply to the mental state involved in such enumerated felonies as rape in the perpetration of which a murder is committed. (Pen. Code, § 187; see, e.g., *People* v. *Chapman,* 261 Cal.*App.* 2d 149, 160-161 [67 Cal.Rptr. 601] [robbery and murder]; *People* v. *Stewart,* 267 Cal. App.2d 366, 374 [73 Cal.Rptr. 484] [robbery and murder].)

It is immaterial that the psychiatrist who testified that Kemp "consciously and knowingly premeditated the commission of each of the crimes involved" (*People* v. *Kemp, supra,* 55 Cal.2d 458, 470) did not respond in the exact language used in *Wolff, Goedecke,* and *Nicolaus* (*People* v. *Risenhoover,* 70 Cal.2d 39, 51 [73 Cal.Rptr. 533, 447 P.2d 925]). "There is no magic in the particular words emphasized in *Goedecke* and *Nicolaus*: the court was there concerned, rather, with the prosecution's failure to introduce expert *proof* on the issue [of mental capacity] . . . ." (*People* v. *Bassett, supra,* 69 Cal.2d 122, 140.)

The prosecution's expert witness at the guilt phase, Dr. Thomas L. Gore, a psychiatrist, testified that Kemp was "fully conscious" when he committed the crimes, that he had "no brain injury," that he had the "ability to premeditate and deliberate," and that he specifically intended to rape his victims. Although vicious, Kemp's crimes were not "bizarre" crimes "whose very character pointed to dissolution of the accused's deliberative faculties." (*People* v. *Chapman, supra,* 261 Cal.App.2d 149, 165; see also, *People* v. *Coogler,* 71 Cal.2d 153, 167 [77 Cal.Rptr. 790, 454 P.2d 686]; compare, *People* v. *Bassett, supra,* 69 Cal.2d 122, 124 [18-year-old defendant "executed his mother and father"]; *People* v. *Nicolaus, supra,* 65 Cal.2d 866, 869 [defendant killed his three children]; *People* v. *Goedecke, supra,* 65 Cal.2d 850, 852 [defendant murdered his father, mother, sister and brother]; *People* v. *Wolff, supra,* 61 Cal.2d 795, 799 [15-year-old defendant murdered his mother].)

Kemp, in June 1957, raped and murdered a nurse in her apartment; there was evidence that he had previously prowled in that area looking for a woman. (*People* v. *Kemp, supra,* 55 Cal.2d 458, 464, 466.) In May 1959, he raped a woman to whom he had offered a ride home. (55 Cal.2d at p. 466.) In July 1959, by posing as a park attendant, he stopped, kidnaped and raped a woman who was driving through the park. (55 Cal.2d at p. 467.)

The psychiatrist for the prosecution testified that Kemp's motive in all the attacks was sexual gratification. The jury was entitled to, and did, believe him; the "evidence of a motive," when coupled with the method of committing the crimes (*People* v. *Risenhoover, supra,* 70 Cal.2d 39, 51-52), and the psychiatric evidence concerning Kemp's mental state, was sufficient to sustain a finding of first degree murder.

Petitioner's reliance on *People* v. *Bassett, supra,* 69 Cal.2d 122, is misplaced. In *Bassett,* two of three prosecution psychiatrists had not

even examined the defendant (69 Cal.2d at p. 141); here, Dr. Gore (and the two other prosecution psychiatrists who testified at the sanity trial) personally examined Kemp. Moreover, in *Bassett,* the defendant, aged 18, murdered his mother and father. (*Id.,* at p. 124.) The crime, when coupled with the limited basis for the prosecution's experts' conclusions and the other evidence, compelled our finding as a matter of law that the defendant could not be guilty of first degree murder. (*Id.,* at p. 148; cf. *People* v. *Coogler, supra,* 71 Cal.2d 153, 166.)

■ Petitioner's contention that this court should now admit more recent evidence, in the form of testimony concerning evidence of brain damage based on electroencephalograph (EEG) readings taken in 1961 prior to Kemp's sanity hearing, is without merit. At the sanity phase of Kemp's trial in 1960, a psychiatrist for the defense, Dr. Solomon, testified that he "had a number of studies done . . . which included a neurological examination, which included an examination of the cerebral spinal fluid, the fluid which circulates around the brain; *an examination of the brain waves by the electroencephalogram* and these were all *negative* for physical disease of the brain." (Italics added.) The prosecution also claimed to have performed EEG tests, which proved negative.

■ It is clear that petitioner merely wishes to relitigate a factual issue determined adversely to him on his direct appeal. And, reiterating his request made in his direct appeal (*People* v. *Kemp, supra,* 55 Cal.2d 458, 471), he asks this court to pick and choose the psychiatric testimony which best supports his contention of diminished capacity. We declined to do so on direct appeal (*People* v. *Kemp, supra,* 55 Cal.2d 458, 471), and we decline to do so in this habeas corpus proceeding.

■ Petitioner also asks this court to exercise its power under subdivision 6 of section 1181 of the Penal Code, and reduce the conviction from first degree to second degree murder, on grounds that the evidence is insufficient. The evidence supports the finding of first degree murder. Whatever the limits of the power granted by that section to this court may be, the record does not indicate that this is a case where that power should be exercised.

The writ is granted. The remittitur issued by this court in case number Crim. 6632 is recalled, and the judgment imposing the death penalty is vacated. The case is remanded to the superior court for a new penalty trial. As to the balance of the judgment the writ is denied and these portions of the judgment affirmed.

Traynor, C. J., Tobriner, J., Burke, J., Sullivan, J., and Coughlin, J. pro tem.,* concurred.

**McCOMB, J.**—I dissent. I would deny the writ.

---

*Assigned by the Chairman of the Judicial Council.