[Crim. No. 33467. Second Dist., Div. One. Feb. 28, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
SHELLEY ANN FOSTER, Defendant and Appellant.

**COUNSEL**

Homer Mason, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

COLE, J.*—In a court trial appellant Shelley Ann Foster was convicted of the murder of her husband. The court fixed the offense as being in the second degree, and sentenced appellant to the state prison. She appeals. We affirm.

### Facts Relating to Motion to Suppress

At about 11:45 p.m. on July 25, 1977, Long Beach Police Officer Milovich, assigned to the narcotics section received a telephone call from an unidentified informant. The caller said there was a dead body in the area of 23d and Lime in the first white garage south of 23d Street on the west side of the alley. The caller also said that "The broad in the front house did the dude in." Within a half hour of the call, or sooner than that, Officer Milovich, together with Sergeant Sutton and Officer Scholtz, went to the alley. All three noted a very strong odor of decaying flesh, and as they walked down the alley and approached the white garage, the odor become stronger. The garage was locked. There was an opening of about eight inches in the garage where a wooden slat had been broken. Shining a flashlight through the opening the officer saw something wrapped in a green blanket but could not tell what it was, although he did note that there were flies around the blanket and trails of ants leading to and from the inside. Thus the officer, not illogically, suspected that there was decaying flesh or possibly a dead body in the blanket. Sergeant Sutton called for a homicide crew and the officers went back to the garage and broke in by prying a lock.

Officer Martinson and four other officers arrived at the location at about 2 a.m., July 26, 1977. Officer Scholtz pried open the lock and Officers Martinson and Bertrand entered the garage and determined that the smell was coming from the wrapped up object. Opening up the wrapping, the witness and Officer Bertrand found that it contained a

---

*Assigned by the Chairperson of the Judicial Council.

human body. A witness who lived in a rear house on the premises looked at the body from a distance and gave information which led the officers to believe the victim was a person who lived in the front residence and who rented or owned the garage. The witness stated that the victim lived there with his wife. Another witness gave the officer the name of appellant and her husband Frank (the victim) and also gave a description of Frank that matched that of the deceased. She also gave a description of appellant that was used later for a broadcast description of a possible suspect. A third witness stated that he had not seen Frank for several days but had seen the defendant and another person removing furniture and household items from the residence. One of the witnesses also stated that appellant and Frank were constantly fighting, to a degree audible to the neighbors. The victim's automobile was also described by one of the neighbors as was a van which had been seen at the location. A warrant was issued to search appellant's house, and the house was searched between 7:30 and 9 a.m. that morning. A radio broadcast was sent out indicating that officers wanted to question appellant.

At approximately 8 a.m., appellant was apprehended driving the van, and taken to the homicide division. After being advised of her constitutional rights, appellant was interrogated and made incriminating statements, including the location of the murder weapon, which was recovered from that location.

We pause in our recitation of the facts to discuss the contention that a motion to suppress evidence should have been granted.

### The Motion to Suppress Was Properly Denied

Appellant's motion to suppress evidence of decedent's body, the items recovered during a search of appellant's house (washcloth, shells, a knife, and a padlock), appellant's statement, and the gun was denied. The thrust of appellant's argument to the trial court was that if the body had not been discovered in the garage, there would have been no basis to arrest appellant. Since no search warrant was secured to enter the garage, the argument goes, the motion should have been granted.

Were we writing on a clean slate, it could be argued on the basis of authority and some logic that since the officers had every reason to believe that a homicide had been committed, it was reasonable for them

to enter the garage to commence their investigation and try to locate the killer. (*People* v. *Amaya* (1979) 93 Cal.App.3d 424, 430 [155 Cal.Rptr. 783]; *People* v. *Wallace* (1973) 31 Cal.App.3d 865, 868 [107 Cal.Rptr. 659].) It was on this theory that the trial court denied the motion to suppress. But we do not write on a clean slate. In *Mincey* v. *Arizona* (1978) 437 U.S. 385 [57 L.Ed.2d 290, 98 S.Ct. 2408], a case decided after the trial court ruled in the instant matter, the United States Supreme Court held, in an opinion joined in on this issue by all of the justices, that there is no "murder scene exception" to the requirement of the Fourth Amendment that a search warrant be procured before premises are entered. In the *Mincey* case, a narcotics officer was shot in Mincey's apartment when he and other officers entered during a narcotics investigation. After the shooting, the narcotics officers looked about the apartment for other victims. They found a woman, wounded, lying in a closet, Mincey, wounded, on the floor, and three other persons, one of them also wounded. Pursuant to a Tucson police procedure that officers should not investigate incidents in which they are involved, the narcotics officers merely guarded the suspects and the premises until homicide officers arrived a few minutes later. The latter proceeded to search the apartment over a period of four days, opening drawers, closets and cupboards, and seizing over 200 objects. The Arizona Supreme Court upheld the search as being a reasonable search of the scene of a homicide where the officers were legally on the premises in the first place. It stated that for such a search to be reasonable, it must begin within a reasonable time after officers learn of the homicide and must be limited to determining the circumstances of the death.

Rejecting this argument, the high court pointed out that such a search does not fall within any exceptions to the warrant requirement previously recognized. (437 U.S. at p. 390 [57 L.Ed.2d at pp. 298-299].) It held that the search could not be justified on the ground that no constitutionally protected right of privacy was invaded (*id.* at p. 392 [57 L.Ed.2d at p. 299]), nor on the ground of exigent circumstances (*id.* at pp. 392-393 [57 L.Ed.2d at p. 300]), nor on the ground that the state had a "vital public interest in the prompt investigation of the extremely serious crime of murder. . . ." (*Id.* at p. 393 [57 L.Ed.2d at p. 300].) It concluded "In sum, we hold that the 'murder scene exception' created by the Arizona Supreme Court is inconsistent with the Fourth and Fourteenth Amendments—that the warrantless search of Mincey's apartment was not constitutionally permissible simply because a homicide had recently occurred there." (Fn. omitted.) (*Id.* at p. 395 [57 L.Ed.2d at p. 302].)

Faced with this holding, we cannot cavalierly write off the decision, as the People seek to do, by stating that *Mincey* simply does not apply to the retrieval of a dead body inside of a garage. We reject the People's argument, therefore, that exigent circumstances by themselves justified the entry. Viewing the situation in this context, the entry into the garage without the prior securing of a search warrant was illegal.

It by no means follows, however, that reversal of appellant's conviction is required. We do not have the slightest doubt that, given the information possessed by the officers *before* they entered the garage, they would have been required by their oaths of office to search for, and interrogate appellant. (There is no reason to believe that appellant would not have been located but for the entry into the garage. She had not fled the neighborhood and, in fact, was apprehended very close to her own house.) The officers had every reason to believe that a dead body was rolled up inside a green blanket in the garage which belonged to the house in which appellant lived. This belief corroborated the information obtained from the unknown informant who telephoned Officer Milovich. The informant had also told the officer that "The broad in the front house did the dude in." Manifestly, the officers were under an obligation to complete their investigation by interviewing appellant. Directly applicable here is the "inevitable discovery" rule. It is discussed at length, and many cases illustrating its application are described, in *People* v. *Superior Court* (*Tunch*) (1978) 80 Cal.App.3d 665 [145 Cal.Rptr. 795]. No useful purpose is served by our repeating here what was said there. We simply note that the rule has been applied to situations where there has been an illegal entry into premises (*Leek* v. *State of Maryland* (4th Cir. 1965) 353 F.2d 526), and in cases involving the discovery of dead bodies. *Tunch* quotes from *Wayne* v. *United States* (1963) 318 F.2d 205, 209 [115 App.D.C. 234], cert. den., 375 U.S. 860 [11 L.Ed.2d 86, 84 S.Ct. 125], as follows: "...'It was inevitable that, even had the police not entered appellant's apartment at the time and in the manner they did, the coroner would sooner or later have been advised by the police of the information reported by the sister, would have obtained the body, and would have conducted the post mortem examination prescribed by law....Thus, the necessary causal relation between the illegal activity and the evidence sought to be excluded is lacking in this case.' (Fn. omitted.)" (80 Cal.App.3d at p. 677.)

Here, given the offensive smell which permeated the alley, the coroner would obviously have been called by someone (Health & Saf. Code,

§ 10250), and he would have been obliged by law to investigate the death. (*Id.* at § 10251.) Thus, the discovery of the victim's body at the time the police entered the garage "did not result in the discovery of witnesses at its scene who would otherwise never have been known to the police." (*Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166, 171 [89 Cal.Rptr. 731, 474 P.2d 683].) The motion to suppress was properly denied.[1]

## Sufficiency of the Evidence

■ Appellant claims that the evidence was insufficient to support her conviction of second degree murder because no malice was proven and because one of the two psychiatrists who testified (Dr. Anderson) stated the legal nonsequitur that appellant "did not have the mental capacity to harbor malice because I felt at the time of commission of present offense she did not . . . have the mental capacity to meaningfully and maturely reflect upon the gravity of her contemplated acts." The claims are without merit.

Before reciting the evidence which was more than substantial to prove malice, we quickly dispose of the claim relating to the psychiatrist's testimony, quoted above. It is a nonsequitur, because the capacity to meaningfully and maturely reflect upon the gravity of one's acts does not relate to malice, but rather to the capacity to premediate which is an ingredient of first degree murder. (*In re Kemp* (1969) 1 Cal.3d 190, 194 [81 Cal.Rptr. 609, 460 P.2d 481].) First degree murder is not involved in this case. The quoted testimony does not affect the result for a second reason. The other psychiatrist who testified (Dr. Abe), likewise on behalf of appellant, stated that while he felt that appellant was not mentally capable of meaningfully and maturely reflecting upon the gravity of her contemplated act, he "also felt that she had the mental capacity to form specific intent to kill, to deliberate, to premeditate and to harbor malice." Thus, at most, appellant is relying on a conflict in the evidence which was resolved against her at the trial level.

■ We also reject the basic argument that there was not enough evidence adduced to establish malice. The People's case at trial consists

---

[1] In light of our holding on this point, it is unnecessary to consider whether the entry could be upheld on the ground that a garage, and not a residence, was involved. (Compare, e.g., *People* v. *Medina* (1972) 7 Cal.3d 30, 40 [99 Cal.Rptr. 630, 492 P.2d 686], entry into open garage upheld, with *People* v. *Hobbs* (1969) 274 Cal.App.2d 402 [89 Cal.Rptr. 123].)

almost entirely of the playing of a tape recording of the interview which Police Officers Collette and Jenkins had with appellant. The recording was transcribed by the reporter as it was played. In the tape recording, appellant recounted how, over a period of two years her relationship with her husband had deteriorated; she supported the family while he commenced having trouble in school, drank heavily, stayed out with his friends (whom appellant did not know) at all hours and physically threatened her at times. The situation had grown worse in recent months, appellant stated. On the night in question, she and her son were staying with friends down the street but she came home when her husband threatened to kick in the door of the friends' house if appellant did not return. Appellant then stated: ["Female voice" meaning appellant and "male voice" meaning the interviewing officer.]

"FEMALE VOICE: So we had just been arguing, and I was just fed up with it. I didn't know what to do, because I couldn't get rid of him. I couldn't leave without him bothering me. And then he went in and laid down, and I just—I went in and got the gun and shot him.

"MALE VOICE: Which—How was he laying on the bed?

"FEMALE VOICE: He was laying on his back.

"MALE VOICE: Which way was his head? Towards the headboard or towards the foot of the bed?

"FEMALE VOICE: The headboard.

"MALE VOICE: The headboard. Was he asleep?

"FEMALE VOICE: I don't know. Apparently so.

"MALE VOICE: Where did you get the gun from?

"FEMALE VOICE: It was in my dresser drawer.

"MALE VOICE: That's the gun that's registered to you; right?

"FEMALE VOICE: Yes.

"MALE VOICE: What kind of gun is it?

"FEMALE VOICE: It's a .25 automatic pistol.

"MALE VOICE: Where is the gun now?

"FEMALE VOICE: It's in my jacket at Miss Harris' house.

"MALE VOICE: In the closet?

"FEMALE VOICE: Right.

"MALE VOICE: Did he know what you were about to do when you got the gun out of the dresser?

"FEMALE VOICE: I guess not. Apparently he was asleep. I don't know.

"MALE VOICE: Did he try to move or get away or anything?

"FEMALE VOICE: No.

"MALE VOICE: Was he drunk?

"FEMALE VOICE: Yes.

"MALE VOICE: But you weren't; right?

"FEMALE VOICE: No. I don't drink.

"MALE VOICE: I'd like you to explain to us—if I'm not getting ahead —what occurred during the next 48 hours following this.

"First of all, do you know where you shot him, what part of the body?

"FEMALE VOICE: I shot him in the head.

"MALE VOICE: Do you know which side of the head?

"FEMALE VOICE: The right side.

"MALE VOICE: So you must have walked up beside him on the—

"FEMALE VOICE: Mm-hmm.

"MALE VOICE: —left side of the bed?

"FEMALE VOICE: About—(inaudible)—side. I was on his right side.

"MALE VOICE: On the bed the headboard faces to the west. So were you on the south side of the bed?

"FEMALE VOICE: Right.

"MALE VOICE: You put the gun right up to his head?

"FEMALE VOICE: Yes.

"MALE VOICE: Or did you stand back and aim it?

"FEMALE VOICE: No. I was—It was only a couple of inches away from his head.

"MALE VOICE: And you pulled the trigger?

"FEMALE VOICE: Mm-hmm.

"MALE VOICE: And hit him somewhere in the right side of the head?

"FEMALE VOICE: Yes.

"MALE VOICE: Was anyone else in the house at the time?

"FEMALE VOICE: No.

"MALE VOICE: Your son was down at the Harris'; is that correct?

"FEMALE VOICE: Yes.

"MALE VOICE: What did you do then?'

"Do you know if he was dead right after he was shot?

"FEMALE VOICE: No, I don't.

"MALE VOICE: Did you leave the bedroom then?

"FEMALE VOICE: Yes. (Inaudible) I had to leave the room I was so upset, and I—

"MALE VOICE: Did you ever check his pulse or anything to see if—

"FEMALE VOICE: I didn't touch him. I couldn't believe that I had done it.

"MALE VOICE: Why did you do it?

"FEMALE VOICE: I was just emotionally tired of everything. I—I don't know.

"MALE VOICE: You had just had enough of him?

"FEMALE VOICE: Yeah. I couldn't get rid of him, you know. I had been trying to get him to leave or just leave me alone or anything. He wouldn't do it.

"MALE VOICE: Did you think that would solve your problem, just to do away with him?

"FEMALE VOICE: I don't know. It's the only thing I could think of at the time. I was upset.

"MALE VOICE: You remember everything pretty well that happened, though; right?

"FEMALE VOICE: Yeah.

"MALE VOICE: Okay.

"FEMALE VOICE: When the gun went off, it was like I woke up out of a dream. I just—I snapped out of it, and I—I couldn't believe that I had done it.

"Then I just stood there and I looked at him for a minute, and I just started to get sick.

"MALE VOICE: When you got the gun out of your dresser, was it already loaded, or did you load it?

"FEMALE VOICE: It had a clip in it. I had to cock it.

"MALE VOICE: To cock it you indicated with your hands that you had to rap (?) the slide back.

"FEMALE VOICE: Yes.

"MALE VOICE: There wasn't any bullets in the chamber.

"FEMALE VOICE: No.

"MALE VOICE: But the clip was in the weapon?

"FEMALE VOICE: Yes.

"MALE VOICE: Was the safety on or off?

"FEMALE VOICE: I don't know.

"MALE VOICE: So you did slide the slide back, put a round in the chamber, and you walked over beside him?

"FEMALE VOICE: Yes."

Appellant's argument that this testimony indicates an absence of malice is based on the contention that she acted emotionally and not rationally. Principal reliance is placed upon *People* v. *Bridgehouse* (1956) 47 Cal.2d 406 [303 P.2d 1018], in which a majority of the court reduced a conviction of second degree murder to manslaughter, holding that the evidence showed that the defendant there was mentally and emotionally exhausted when he killed his wife's lover and that such provocation as to provoke in a reasonable man a heat of passion had been established. While the People have not replied to appellant's argument concerning *Bridgehouse*, the evidence there, while somewhat resembling some of the present testimony, also presents marked differences. The defendant in *Bridgehouse* had no real recollection of having drawn the gun which he carried as a deputy sheriff, nor of firing it. No medical testimony was presented in *Bridgehouse*, so far as can be gleaned from the opinion. Also, the defendant in that case suffered a great shock when he unexpectedly came upon the victim living in the house which defendant's mother-in-law lived.

In contrast, in the present case, appellant had a memory of exactly what happened and, indeed, her description of the shooting involved conduct requiring the taking of positive steps—securing and cocking the weapon, and approaching the sleeping victim before shooting him. In addition, Dr. Abe testified on the basis of his interview with appellant that she acted with malice. This testimony is supported by the substantial evidence to which we have referred. ■ Even regarding Dr. Anderson's testimony as being in conflict with that of Dr. Abe, resolution of the conflict and of appellant's capacity to kill with malice was a question for the trial court to resolve and we may not disturb the conflict on appeal. (*People* v. *Theriot* (1967) 252 Cal.App.2d 222, 239 [60 Cal.Rptr. 279].)

### Other Contentions

■ The case was tried before the decision of the California Supreme Court in *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318], rejecting the M'Naughten test of insanity and substituting therefor the American Law Institute test. Appellant argues that the trial court failed to use the *Drew* test, and that it is reasonably probable that a contrary result would have been reached under *Drew*. Appellant failed to plead not guilty by reason of insanity. *Drew* expressly applies retroactively "only to those cases not yet final in which the defendant has pled not guilty by reason of insanity and to cases that have not yet come to trial as of the date of the finality of this opinion." (22 Cal.3d at p. 348.) Since appellant did not tender a not guilty by reason of insanity plea, the court did not have to address itself to *Drew* at all. Her argument that she failed to plead not guilty by reason of insanity because counsel believed that she did not fall under the M'Naghten test and that she therefore is deprived of due process is without merit. It contravenes the express statement of the Supreme Court concerning retroactivity and is based upon matters which are not part of the record of this appeal.

■ As noted above, when the tape recording of appellant's confession was played to the court the court reporter transcribed it. Thereafter, in an attempt to secure absolute accuracy, the reporter replayed the tape to herself. She started this process one afternoon and found no major inconsistencies after playing the tape against her notes for approximately 25 minutes. After playing the tape back repeatedly, she changed her notes in certain places by adding or changing something but it was not anything substantive that would change the

meaning. Unfortunately, when the reporter resumed her playback operations the next morning, she was unable to play back the balance of the tape. Based on this inability appellant urges that there has been a destruction of evidence, a la *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], and that the record is not complete, depriving appellant of litigating a crucial issue before this court and further depriving her of due process. It is at once apparent that this case is not at all like *Hitch*. In fact, it is not at all clear to us that anything has been destroyed. The record shows that the reporter and the trial court were unable to play back some small portion of the tape, not that it was permanently and irretrievably erased. In any event, there is no indication that the transciption appearing in the record is inaccurate in any material respect at all. Appellant offers no challenge whatsoever to the accuracy of any of her statements reported in the record. The point is utterly without merit.

The judgment is affirmed.

Lillie, Acting P. J., and Hanson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 24, 1980.