Filed 12/21/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046864 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1761829) |
| v. | |
| MARK JAYSON STA ANA, | |
| Defendant and Appellant. | |

Defendant Mark Jayson Sta Ana had sex with a woman while she was intoxicated and unconscious. A jury convicted him of rape of an intoxicated person and rape of an unconscious person. On appeal from the judgment sentencing him to three years in prison, defendant argues the interrogating officers violated his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); the trial court made improper comments when questioning an expert witness; defense counsel provided ineffective assistance by not objecting to a nurse's qualifications to testify as an expert; the jury instructions did not correctly define consent; the trial court erred in resolving a jury deadlock; punishment for rape of an unconscious person should have been stayed; and that the various errors were cumulatively prejudicial. We agree that punishment for rape of an unconscious person must be stayed under Penal Code section 654, but find no basis for reversal. We will modify the judgment to stay that punishment and affirm the judgment as modified.

## I. TRIAL COURT PROCEEDINGS

Both charged counts (rape of an intoxicated person (Pen. Code, § 261, subd. (a)(3)) and rape of an unconscious person (Pen. Code, § 261, subd. (a)(4))) related to defendant's conduct with one woman on one night in April 2017. (Unspecified

statutory references are to the Penal Code.)  We will refer to the victim as K.D. in the interest of privacy.  (Cal. Rules of Court, rule 8.90(b)(4).)

## A. TRIAL EVIDENCE

### 1. Prosecution Case

K.D. testified that she was born in 1994 in the Philippines and had immigrated to the United States with her family in 2002.  In 2017 she lived in an apartment with her parents, her brother, and her three-year-old son.  Her parents went to the Philippines for about a month around April 2017.

K.D. had met defendant at a party earlier in 2017.  Defendant was a friend of Glen, whom K.D. was dating.  After K.D. learned that defendant had moved out of his family home and was living in his car, she invited him to stay in her parents' bedroom while they were out of the country.  She made the offer both to give him a place to stay and because she wanted someone else staying at the apartment.  He agreed, and she gave him a key because she trusted him.

K.D. and defendant had consensual sex on two occasions before the incident that resulted in criminal charges.  She testified that on the first occasion they had been drinking, "we got a little tipsy and drunk, and he picked me up from the chair that I was sitting [*sic*], and he took me to my parents' room with him."  She testified that she could not recall many details from the interaction, but she confirmed that they had sexual intercourse that night.  She acknowledged on cross-examination that she told defendant she did not want to kiss or receive oral sex, and that he complied with those requests. That encounter occurred the first night defendant spent at the apartment.  The second encounter occurred on another evening when K.D. and defendant were drinking at the apartment with a male friend.  K.D. went to her parents' bedroom to sleep and defendant followed her.  They had sex.  K.D. testified that the morning after the second encounter she told defendant she did not want to have a sexual relationship anymore because she was dating their mutual friend, and defendant agreed.  K.D. testified that during both

2

encounters her level of intoxication was an eight on a scale of one being totally sober to ten being passed out drunk.

K.D. sent defendant a text message a few days later on Easter Sunday because he had not come back to the apartment. He informed her he was staying with his family again. She texted defendant that she was drinking with some friends at her apartment. (K.D. later gave the police access to her phone, and some of her text messages with defendant and others were admitted into evidence at trial. We reproduce the messages here verbatim, with any errors in the original.) She sent defendant the message, "Im drunk." He responded, "Looks like ur fck up." He told her he was coming over, and she acknowledged the message. There was a later text message from defendant that said, "Damn girl ur out lol." K.D. did not remember that message. K.D. testified that she had consumed a lot of drinks, and felt "[r]eally drunk." She decided to go to bed, and told her friends they could stay at the apartment. She testified that when she went to bed that night she was an eight out of ten on the intoxication scale. She fell asleep next to her son.

K.D. testified that the next thing she remembered was "getting shaked, and my body was shaking, and I was wondering why. And realized that I was getting penetrated." She opened her eyes and saw defendant on top of her, and she felt his penis inside of her vagina. She then felt liquid dripping near her vagina, at which point defendant pulled her pants back up. K.D. had fallen asleep with underwear and pajama pants on. She testified that she did not say anything to defendant because she was afraid that he might hurt her. She stated she was "too shocked to even know what I was thinking." She testified that she felt more intoxicated upon waking up, a nine out of ten. After she felt him pull her pants back up she lost consciousness and passed out because she was "too intoxicated."

K.D. awoke later and called 911. Defendant was asleep in her parents' room and she wanted him out of the apartment. A recording of the 911 call was admitted into

3

evidence and played for the jury. K.D. also texted a friend that morning that defendant "raped me last night while I was knocked out." Officers arrived and arrested defendant.

Defendant was interrogated by two detectives at the police station after waiving his *Miranda* rights. (Defendant argues on appeal that the *Miranda* advisement was defective, which we address in Part II.A.) A video of the interrogation was admitted into evidence and played for the jury. Defendant told the detectives that he and K.D. had a sexual relationship and that she had told him she no longer wanted to have a sexual relationship. He initially told them he had sex with K.D. just one time, but eventually admitted having sex on the three occasions K.D. described at trial. Regarding Easter Sunday, defendant told the detectives that K.D. had been texting him during the day asking whether he was coming to the apartment. She seemed drunk. Defendant decided to go to K.D.'s apartment. Defendant initially told the detectives that he went directly to sleep after K.D.'s friends left the apartment. A detective told defendant DNA had been collected from K.D. and asked him whose DNA he thought it would match. He responded, "I think it's going to be me." Asked to elaborate, defendant said after K.D.'s friends left he "went there in her room and have sex with her while she's sleeping that's it." Elaborating further, defendant stated he grabbed K.D., took off her pants, and "put my penis into her pussy." Asked what K.D. was doing, defendant stated "[s]he was sleeping." Asked why defendant had sex with K.D. despite her having previously told him she no longer wanted to have a sexual relationship, defendant stated: "So I don't know what happened to me like that. I feel like -- I don't know. I feel very horny that night."

K.D. underwent a sexual assault response team (SART) examination by a sexual assault forensic nurse. The nurse testified at trial as an expert in "basic anatomy and physiology, collection and preservation of evidence of sexual assault, the characteristics of consensual and nonconsensual intercourse, and alcohol absorption and metabolism." (We discuss defendant's appellate argument related to the nurse's qualifications in Part

4

II.C.) K.D. had multiple abrasions and lacerations to her external and internal vaginal areas, including redness at her cervix.

The prosecutor asked the SART nurse about relative injury risk in consensual versus nonconsensual sex. The nurse testified that the risk of injury is higher in nonconsensual sex. She explained that in consensual sex a woman will naturally tilt her pelvis to facilitate optimal penetration, which reduces the risk of injury. During consensual sex a woman is also more likely to produce natural lubrication and have increased blood flow to her vaginal area, which further reduces injury risk. K.D.'s injuries were consistent with a lack of pelvic tilt. On cross-examination, the nurse acknowledged that injuries can occur during consensual sex, and that injuries can occur from non-sexual activities such as personal hygiene and tampon use.

DNA samples were taken from genital swabs of defendant and K.D. The criminalist who testified about the results stated that the chance of the DNA samples matching someone other than K.D. and defendant was one in 6.7 quintillion for the genome regions that were tested.

## 2. Defense Case

Defendant testified at trial through an interpreter. He was born in the Philippines and immigrated to the United States in 2012. He understood English, but was more comfortable testifying in Tagalog. He testified that he met K.D. through their mutual friend Glen, and that he knew that K.D. and Glen were dating. Defendant was living with his family when he met K.D., but moved out following an argument.

K.D. offered to let defendant sleep at her apartment, and he initially declined her offer and slept in his car. He went to K.D.'s apartment one day because she said she needed a paper bag to help her breathe (apparently because of a panic attack). They went for a drive and then came back to the apartment for alcoholic drinks. They had sex that night, and he agreed to spend the night at the apartment. He accepted a key to the apartment and started staying there.

5

On another evening defendant drank alcohol at the apartment with K.D. and another male friend. K.D. went to her bedroom at some point because the men were being too loud. The male friend followed K.D. into her room, and defendant joined as well. K.D. agreed to a massage from defendant, and eventually left her bedroom to lie down in the other bedroom. Defendant followed her and continued massaging her in bed. K.D. then took off her shorts and they had sex. Defendant testified that she was "cussing and groaning" while they had sex, which he interpreted as her enjoying it. The next morning K.D. told defendant that she did not want to have sex with him anymore, and he said "okay."

Defendant's father asked him to move back into the family house on Easter Sunday. K.D. sent defendant text messages the same day, asking him to join her and her friends for drinks at her apartment. He testified K.D. was "telling me that she want[ed] to do a booty call," and he did not know what that meant. He clarified the request for a booty call was communicated orally via video chat. Defendant decided to go to K.D.'s apartment, and knew that she had been drinking. He greeted K.D.'s friends when he arrived, and they told him she was in her bedroom sleeping. Defendant testified that he looked into K.D.'s room and saw that she appeared to be asleep. He went to the bedroom where he had been sleeping and sent K.D. the "Damn girl ur out lol" text, which he claimed at trial was intended to ask "if she was really drunk, that she can no longer take care of herself."

Defendant testified that he went to K.D.'s room to tell her that her friends were leaving and she responded, "okay." He lay down next to her and started to pull down her pajamas. He stated that she helped him pull them off "all the way." He acknowledged remembering the earlier conversation about her not wanting to have sex with him anymore, but thought "sometimes she changes her mind." He testified that she opened her legs and they had sex. He testified that she was awake, and that she was moaning softly. He ejaculated on K.D., "wiped her," and "put her pajamas back because I know

6

she was a bit tired." She rolled onto her side, and he went back to the other bedroom. The police woke him up the next day and arrested him.

On cross-examination, defendant acknowledged telling the police during the subsequent interrogation that he knew K.D. was drunk when he had sex with her on Easter Sunday and that he believed she had been too drunk to drive or take care of herself. He acknowledged having told the police he was the one who took K.D.'s pants off, and said he made that statement because he "did not know how I was going to say it in English at that time." He acknowledged telling the police that K.D. was sleeping when he had sex with her on Easter Sunday. He confirmed that during the encounter on Easter Sunday K.D. never said anything to him, did not kiss him, and did not switch positions to get on top of him.

A clinical psychologist testified as an expert on "forensic psychology, specifically with respect to suggestibility and compliance." He had conducted a clinical interview with defendant over the course of several hours, and reviewed case files including the transcript of defendant's interrogation. This included a personality test, an IQ test, and the "Gudjonsson suggestibility scale." He explained he performed the tests in English because that was the language in which the interrogation took place. The psychologist opined that defendant was an individual with substantially below average intelligence. Regarding suggestibility, the psychologist believed defendant had "prominent dependent personality traits" meaning he was "very highly suggestible." The psychologist opined that the foregoing traits would make defendant "likely to or ... prone to altering his views and his statements in response to external pressure during the custodial interview." The court asked the psychologist the following hypothetical after counsel finished their questioning: "The test, does it take into consideration ethnic background, or maybe nationality? Say, for example, the same questions asked of a white male of his age that grew up in the City of Boston versus someone that grew up in a rice pa[dd]y, in some

7

field somewhere in a different count[r]y?  Would it be answered the same way?"  (We discuss defendant's claims relating to the court's question in Part II.B.)

## B. DELIBERATION, VERDICT, AND SENTENCING

After less than six hours of deliberation, the jury submitted the following note: "We are at an impass[e] w/ no reasonable hope of reaching a unanimous decision.  How should we proceed?  This applies to both counts.  We are 11-1 on both counts."  The court instructed the jury with CALCRIM No. 3551 (further instruction about deliberations), and admonished the jury to continue deliberating.  (We discuss defendant's challenge to the trial court's handling of the apparent deadlock in Part II.E.) The jury returned guilty verdicts on both charged counts the next day.

The trial court sentenced defendant to the low term of three years for rape of an intoxicated person (§ 261, subd. (a)(3)), and imposed a concurrent mitigated three-year sentence for rape of an unconscious person (§ 261, subd. (a)(4)).

## II.    DISCUSSION

## A. ADEQUACY OF *MIRANDA* ADVISEMENT

Defendant argues the trial court erred by denying a motion to exclude statements from his interrogation based on an asserted violation of *Miranda*.  No "talismanic incantation" by a peace officer is required to satisfy *Miranda*.  (*California v. Prysock* (1981) 453 U.S. 355, 359 (*Prysock*); accord *Florida v. Powell* (2010) 559 U.S. 50, 60.) We review the advisement de novo (*People v. Bradford* (1997) 14 Cal.4th 1005, 1032), and determine whether it "reasonably 'conve[yed]' " to defendant his rights as required by *Miranda*.  (*Duckworth v. Eagan* (1989) 492 U.S. 195, 203 (*Duckworth*).)

The following exchange occurred before the detectives asked defendant about the charged crimes.  A detective told defendant:  "You have the right to the presence of an attorney before and during any questioning.  Do you understand that?"  After defendant responded affirmatively, the detective made the following statement:  "If you cannot afford an attorney, one will be appointed for you free of charge before any questioning, if

8

you want.  Do you understand that?"  Defendant responded, "Yes, sir," and did not invoke his right to counsel.  Defendant moved in limine to exclude the statements he made during the interrogation, arguing that the detectives did not provide an adequate *Miranda* advisement.  The trial court denied the motion, stating that it had listened to the interrogation and found the "*Miranda* rights were read as required."

Defendant argues the *Miranda* advisements here were defective because the "police officer told [defendant] only that he had a right to appointed counsel *before*, but not during, the interrogation."  But that is only one interpretation.  The first advisement made clear that defendant had the right to an attorney before and during any questioning, and did not differentiate between retained or appointed counsel.  The second advisement explained that defendant had the right to a free, appointed attorney, and noted that the attorney would be appointed "before any questioning."  Read together, we find the advisements reasonably conveyed to defendant that he had a right to counsel (retained or appointed) before and during any questioning, and that if he could not afford an attorney one would be appointed for him before any questioning began.  Given the structure of the second advisement here, it would add nothing to inform defendant that an attorney would be appointed for him both before and during questioning because an attorney would have been appointed only once (i.e., *before* any questioning).  "[N]othing in the warnings given [defendant] suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general."  (*Prysock*, *supra*, 453 U.S. at pp. 360–361.)

That the detective's initial advisement broadly informed defendant he had a "right to the presence of an attorney before and during any questioning" distinguishes this case from those relied on by defendant where *Miranda* advisements did not make clear that the right to an attorney included an attorney's presence during questioning.  (Citing *U.S. v. Noti* (9th Cir. 1984) 731 F.2d 610, 614 [*Miranda* violated where advisement did not mention the right to an attorney during questioning: "you have the ... right to the

9

services of an attorney before questioning, if you desire an attorney, and cannot afford one, an attorney will be appointed by the Court with no charge to you."]; *People v. Lujan* (2001) 92 Cal.App.4th 1389, 1397 [*Miranda* violated where advisement did not mention the right to an attorney during questioning: " 'if you don't have money to hire an attorney, one's appointed to represent you free of charge.' "].)

Defendant cites two California decisions—*People v. Stewart* (1968) 267 Cal.App.2d 366 (*Stewart*) and *People v. Bolinski* (1968) 260 Cal.App.2d 705 (*Bolinski*)—that are of limited precedential value because they were decided before the United States Supreme Court clarified in *Duckworth* that the test for *Miranda* compliance is whether an advisement reasonably conveys to a defendant his or her rights. (*Duckworth*, *supra*, 492 U.S. at p. 203.) Those cases are also factually distinguishable because the advisements did not clearly state the defendants had a right to counsel before and during any interrogation. (*Stewart*, at p. 378, fn. 16 [" 'that he had a right to an attorney, and he could have his attorney here' " and that " '[h]e had a right to have the Public Defender appointed in case he couldn't afford an attorney' "]; *Bolinski*, at p. 723 ["An advisement that counsel would be appointed by the court is not the equivalent of an advisement that counsel would be provided to be present at the interrogation."].)

Defendant argues in his reply brief that the advisements could have been clearer and that the "the officers did not scrupulously comply with *Miranda*." But looking to whether the advisements reasonably conveyed to defendant his *Miranda* rights, we conclude they met that standard. Defendant asserts the advisements here "drew an express distinction between the scope of appellant's right to counsel in general, and the scope of his right to appointed counsel." He also contends the advisements here informed defendant that he had a "right to counsel 'before and during' the interrogation, *or* a right to appointed counsel 'before' the interrogation." Defendant's argument loses sight of the actual content of the advisements. As we have explained, the first advisement did not differentiate between retained versus appointed counsel, and the

10

second advisement is reasonably understood to address the *timing* of appointment rather than the availability of appointed counsel.

The trial court did not err in denying defendant's motion.

## B. COMMENTS BY THE TRIAL JUDGE REFLECTING CULTURAL BIAS

Defendant contends the trial judge made improper comments during the testimony of a defense expert, or alternatively that his trial counsel was ineffective for failing to object to the court's comments. Although defendant did not object in the trial court, we conclude he should not be barred from raising the issue on appeal, as it would be unreasonable under the circumstances here to require counsel to challenge the court's own questions as explicitly or implicitly biased. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party."].)

Inherent in a court's authority under Evidence Code section 775 to call witnesses in an action is the authority to question witnesses called by the parties. (*People v. Harris* (2005) 37 Cal.4th 310, 350 (*Harris*).) In doing so, the "judge's interrogation ' "must be ... temperate, nonargumentative, and scrupulously fair." ' " (*Ibid.*) Defendants have a due process right to a judge with " 'no actual bias against the defendant or interest in the outcome of his particular case.' " (*Id.* at p. 346.) But our role as a reviewing court " 'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid,' " it is to " 'determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' " (*Id.* at p. 347.) And "[w]here only the appearance of bias is at issue, a litigant's recourse is to seek disqualification under state disqualification statutes." (*People v. Freeman* (2010) 47 Cal.4th 993, 996.)

Defendant's opening brief states the "judge characterized appellant—in open court and in front of the jury—as 'someone that grew up in a rice paddy, in some field

11

somewhere in a different country.' " (Footnote omitted.) Defendant also states the "court asked the witness whether appellant's low intelligence was the result of his growing up 'in a rice paddy, in some field somewhere in a different country.' " The concerning statement arose when the trial judge posed to a defense psychologist the following questions: "The test, does it take into consideration ethnic background, or maybe nationality? Say, for example, the same questions asked of a white male of his age that grew up in the City of Boston versus someone that grew up in a rice pa[dd]y, in some field somewhere in a different count[r]y? Would it be answered the same way?" The psychologist responded: "Part of the whole idea of testing, there are different adaptations and different translations, even in Spanish and different editions for different regions. The content of the question varies in Spain or in Mexico. To give you an example, in Argentina there are different things that people talk about or learn at school, so you cannot compare fairly. Not all tests have different editions or different versions. And some tests don't look into that."

The court's *initial* question (whether the test accounted for "ethnic background" or "nationality") was neutral and appears to have been posed with the legitimate intent to understand whether the psychologist's tests considered those factors. But we agree with defendant that the trial court's example about whether "a white male of his age that grew up in the City of Boston" would answer the test questions in the same way as "someone that grew up in a rice paddy, in some field somewhere in a different count[r]y," would cause a reasonable person to question whether the court was obliquely and unfavorably describing defendant as an individual devoid of seeming intellectual sophistication. The gratuitous reference to a "rice paddy," particularly in a case involving an Asian defendant, would reasonably offend many people, including defendant, the victim (here, also Asian), the witness, jurors, counsel, court employees, and court observers. For this reason, it is the duty of every judge to scrupulously avoid using terms that are commonly viewed as racial or cultural tropes, even if used without any intended bias or prejudice, so

12

that court participants and observers can maintain confidence in the court's fairness to all persons.  (See Cal. Code of Jud. Ethics, canon 3B(5).)

We do not condone the trial court's language choice, but we cannot on this record conclude that " 'the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' " (*Harris*, *supra*, 37 Cal.4th at p. 347.)  It appears that the court's problematic example was intended, perhaps ironically, to better understand whether the tests might contain cultural bias, or could control for possible bias in some way.  The trial court's misguided word choice was mitigated by the witness's dexterous pivot to the effects of the Spanish language and the educational systems of Spain, Mexico and Argentina on the test answers.  The expert's response simultaneously shifted the focus from inferences about defendant's background derived from stereotypes and addressed the issue of cultural bias in the tests themselves.

The authorities defendant relies on do not persuade us that this is reversible error, because they arose in different contexts and involved egregious misconduct unlike the isolated question the trial judge posed here.  (E.g., *Gonzalez v. Commission On Judicial Performance* (1983) 33 Cal.3d 359, 376 [Supreme Court affirmed judge's removal based in part on judge "engag[ing] in personal verbal attacks" against defendants and jurors, including asking an African American prospective juror if she knew the price of watermelon]; *People v. Tatum* (2016) 4 Cal.App.5th 1125, 1128–1129 [trial judge stated during voir dire that she had had " 'horrible experiences with plumbers' " and that if she heard someone is a plumber she would think " ' "God, he's not going to be telling the truth," ' " where Tatum's alibi witness was a plumber].)

### C. EXPERT QUALIFICATIONS AND ASSISTANCE OF COUNSEL

Defendant argues his counsel was ineffective for not objecting to the SART nurse's expert qualifications related to "the genesis of sex related injuries."  Expert testimony is admissible when related to a "subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (Evid. Code,

13

§ 801, subd. (a).) To qualify as an expert, the witness must have "special knowledge, skill, experience, training, or education sufficient to qualify" the witness as an expert on the subject to which his or her testimony relates. (Evid. Code, § 720.) An expert medical witness may "give an opinion of the cause of a particular injury on the basis of the expert's deduction from the appearance of the injury itself." (*People v. Bledsoe* (1984) 36 Cal.3d 236, 249.) We generally review the trial court's determination that a witness qualifies as an expert for abuse of discretion. (*People v. Jones* (2013) 57 Cal.4th 899, 949.) But because defendant did not object on that basis in the trial court, we review this issue to determine whether counsel provided ineffective assistance by not objecting.

To establish ineffectiveness of trial counsel in violation of the right to counsel under the Sixth Amendment to the United States Constitution, a defendant must show both a deficiency in counsel's performance and a prejudicial effect of the deficiency. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216–217 (*Ledesma*).) The "decision whether to object, move to strike, or seek admonition regarding such testimony is highly tactical, and depends upon counsel's evaluation of the gravity of the problem and whether objection or other responses would serve only to highlight the undesirable testimony." (*People v. Catlin* (2001) 26 Cal.4th 81, 165 (*Catlin*).) To prove prejudice from deficient performance, a defendant must affirmatively show a reasonable probability that, but for trial counsel's error, the result would have been different. (*Ledesma*, at pp. 217–218.)

The SART nurse testified that she had an undergraduate degree in nursing and then underwent specialized training to become a SART nurse. She had taken a two-week specialized SART training course (one week about adult exams and one week about pediatric exams). She conducted over 85 SART exams to become qualified (some of which were supervised by a more experienced nurse). She confirmed that she had received training "about the characteristics of consensual versus nonconsensual intercourse" and "how those two things might look different." Defense counsel asked voir dire questions about the SART nurse's qualifications as to another element of her

14

expertise, but did not object to the nurse being qualified as an expert on, among other things, the "characteristics of consensual and nonconsensual intercourse." The nurse testified that K.D.'s injuries were consistent with nonconsensual intercourse, based on a hypothetical that mirrored K.D.'s testimony about how the alleged rape occurred.

On cross-examination, the SART nurse acknowledged that injuries can occur during consensual sex, and that injuries can occur from non-sexual activities. Defense counsel also asked about the basis for the nurse's opinions. She testified her opinions derived from evidence-based research. Asked how many articles she had read on the subject, she responded "I don't know if I could count the numbers of research and the lectures from, you know, the conferences that I have attended. A great amount." She noted some of her expertise was based on "access to research I had during my master's to nursing libraries that are, you know, peer reviewed, that are seen as reliable, as well as books that I had from the library." She acknowledged that she could not "say that all of the research is reliable" because some of the research "cannot reflect [the] general population." She cited a book from 1997 for the proposition that the probability of vaginal injury during consensual sex was between four and 10 percent. She also acknowledged that a 2010 article (a defense exhibit) stated that the presence or absence of genital injury should not be used to render an opinion about consent to intercourse. (That exhibit does not appear to have been admitted into evidence.) Defense counsel continued asking the expert to identify specific articles she relied on regarding consensual versus nonconsensual sex, and the trial judge eventually asked counsel to clarify whether counsel was asking about articles she had consulted "from day one of nursing school, or are we talking just in preparation for this case?" Counsel clarified he was asking about "articles in preparation for this case that she actually brought." On re-direct examination, the nurse confirmed that she personally performed K.D.'s SART exam and that she based her opinions in part on her own observations.

15

Defendant argues that the "full extent" of the evidence of the SART nurse's qualifications about the visual characteristics of consensual versus non-consensual sex was her answering "Uh-huh, correct" in response to a question on that topic. He contends her "testimony does not provide any evidence that she had sufficient knowledge, skill, training, education, or experience to qualify as an expert regarding the origin of sex related injuries." Defendant's argument does not accurately reflect the expert's testimony.

The SART nurse made clear her testimony was based on classroom training, personally conducting dozens of SART exams, reading peer-reviewed articles during her master's program, and attending conferences. She discussed a 1997 book to support her assertion that injuries were less likely for consensual versus nonconsensual sex.

Defense counsel effectively cross-examined the expert, including through trying to discredit the sources she relied on by introducing more recent articles that concluded genital injury should not be used to render an opinion about whether sex was consensual. But that cross-examination addressed the reliability of the expert's opinions, not her qualifications to offer them.

The record demonstrates that the expert's opinions were based on her special knowledge, skill, experience, training, or education on a topic sufficiently beyond the common experience of a trier of fact. (Evid. Code, §§ 801, 720.) Because there was no basis for objecting to the nurse's expertise regarding the visual characteristics of consensual versus nonconsensual sex, counsel was not ineffective for not doing so. (*People v. Ochoa* (1998) 19 Cal.4th 353, 463.)

### D. JURY INSTRUCTIONS AND ASSISTANCE OF COUNSEL

Defendant argues the trial court erred by not instructing the jury on all elements of rape of an intoxicated person. The jury was instructed about the elements for rape of an intoxicated person based on CALCRIM No. 1002. The instruction stated, in relevant part: "To prove that the defendant is guilty of [rape of an intoxicated woman], the People

must prove that:  [¶]  1. The defendant had sexual intercourse with a woman;  [¶]  2. He and the woman were not married to each other at the time of the intercourse;  [¶]  3. The effect of an intoxicating substance prevented the woman from resisting; and  [¶]  4. The defendant knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting."  The instruction also stated that "A person is prevented from resisting if she is so intoxicated that she cannot give legal consent.  [¶]  In order to give legal consent, a person must be able to exercise reasonable judgment.  In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences.  Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved."  Defendant's trial counsel did not object to that instruction, and did not request clarification of any concepts in it.

"No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, ... unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)  A trial court has a sua sponte duty to correctly instruct the jury on all elements of any charged offenses. (*People v. Mil* (2012) 53 Cal.4th 400, 409.)  But a "trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel," and the failure to request clarification of an otherwise correct instruction forfeits the issue on appeal. (*People v. Lee* (2011) 51 Cal.4th 620, 638 (*Lee*).) We review claims that a trial court has misinstructed a jury de novo.

The important distinction between actual and legal consent in prosecutions for rape of an intoxicated person was explained in *People v. Giardino* (2000) 82 Cal.App.4th 454 (*Giardino*).  The trial court in *Giardino* denied Giardino's request that the "jury be instructed either that lack of consent was an element of those crimes or that consent is a defense." (*Id.* at p. 459.)  On appeal, Giardino argued that the "trial

17

court should have defined consent in accordance with section 261.6 and instructed the jury that lack of consent is an element of the offenses of rape by intoxication." (*Ibid.*) The *Giardino* court explained that in the context of rape, there is a difference between actual and legal consent. Actual consent is "consent that is actually and freely given without any misapprehension of material fact." (*Id.* at p. 460.) To support a defense to rape based on consent, a defendant must show *both* that the victim actually consented to sexual intercourse *and* that the victim had sufficient capacity to give that actual consent. Certain types of rape "deal with the victim's lack of capacity, i.e., with the lack of legal consent." (*Ibid.*) Reviewing the elements of rape of an intoxicated person (§ 261, subd. (a)(3)), the *Giardino* court concluded the offense "proscribes sexual intercourse with a person who is not capable of giving legal consent because of intoxication," and that "the issue is not whether the victim actually consented to sexual intercourse, but whether he or she was capable of exercising the degree of judgment a person must have in order to give legally cognizable consent." (*Giardino,* at p. 462.)

Defendant argues that to prove rape of an intoxicated person, the prosecution had to "prove that [K.D.] did not consent," meaning that "consent was a required element of the offense" and the trial court therefore had a sua sponte duty to define it for the jury. He also argues the "prosecutor was required to prove that appellant knew or should have known that [K.D.] did not 'give legal consent.' " But the prosecution did not have to prove that K.D. did not consent; it had to prove that she *could not* consent due to the effects of intoxication. Lack of actual consent is not a required element of rape of an intoxicated person and the trial court therefore had no sua sponte duty to define it.

We also interpret defendant's appellate argument as a claim that the trial court should have clarified or better explained the otherwise correct CALCRIM No. 1002. Because defendant's trial counsel did not request the clarification he seeks on appeal (*Lee*, *supra*, 51 Cal.4th at p. 638), we review the issue as a claim of ineffective assistance.

18

Defendant argues the trial court "failed to instruct the jury that legal consent is defined to mean 'positive cooperation in act or attitude pursuant to an exercise of free will.' " (Quoting § 261.6.) But the relevant inquiry for the jury was whether K.D. was so intoxicated that she was *incapable* of giving legal consent. Defendant interprets *Giardino* as holding that "in instructing the jury on this element 'the jury should have been instructed that its task was to determine whether, as a result of her level of intoxication, the victim lacked the legal capacity to give "consent" as that term is defined in section 261.6.' " (Quoting *Giardino*, *supra*, 82 Cal.App.4th at p. 466, italics omitted.) But the *Giardino* court was discussing the lower court's response to a jury question seeking the "legal definition of 'resistance.' " (*Id.* at p. 464.) There was no similar jury question in this case. Further, the *Giardino* court's statement is consistent with what we have already observed: that the relevant inquiry here was K.D.'s *capacity* to consent.

Defendant contends the jury instructions violated his right to present a defense because his theory of the case was that K.D. "consented to sex by her positive cooperation in the act." The jury instructions here adequately encompassed defendant's theory of the case, which trial counsel argued to the jury: "there are a couple of issues in this case for you to consider. The first is intoxication, was [K.D.] too intoxicated to consent to sex? The answer to that question is no. She was not too intoxicated to consent. And the secondary question to that, even if she was, [defendant] didn't know that. He had no way to know that." Counsel then asked the jury "to consider [defendant's] perspective" and described the facts of the case culminating in K.D. "pull[ing] her pants down and open[ing] her legs." Nothing in the instructions limited counsel's ability to argue that K.D. cooperated in having sex with defendant and that her cooperation either evidenced consent or could reasonably be perceived by defendant as giving consent.

We conclude the jury was properly instructed about the elements of the charged offenses and defendant's theory of the case. The proposed addition would not have

19

assisted the jury in determining whether defendant committed the charged offenses. Defense counsel was not ineffective for not requesting further instructions on this point.

### E. JURY DELIBERATIONS AND ASSISTANCE OF COUNSEL

In response to a note from the jury that it was deadlocked, the trial court instructed the jury to continue deliberating. Defendant argues the court should have first questioned the jury to determine whether there was a reasonable probability that it could reach a verdict. "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (§ 1140.) The trial court " 'is not bound to take as final the statement of the [jurors] that they cannot agree upon a verdict.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 159 (*Valdez*).) A trial court's decision to instruct a jury to continue deliberating is reviewed for abuse of discretion. (*Ibid.*)

The jury deliberated for roughly two-and-one-half hours on the first day of deliberations and three hours the next morning, and then submitted the following question in writing: "We are at an impass[e] w/ no reasonable hope of reaching a unanimous decision. How should we proceed? This applies to both counts. We are 11-1 on both counts." The minute order notes the court informed the prosecutor and defense counsel about the juror question via conference call and indicated it would speak with the jury on the record.

The court addressed the jury as follows, based on CALCRIM No. 3551: "I understand the last note we got from Juror Number 11 as the Foreperson is that you are dead locked 11 to one. And I want to read something to you before I ask you some questions. [¶] Sometimes juries that have difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict on one or more of the counts. Please consider the following suggestions: [¶] Do not hesitate to re-examine your views. Fair

20

and effective jury deliberations require a frank and forthright exchange of views. Each of you must decide the case yourself and form your individual opinion after you have fully and completely considered all of the evidence with your fellow jurors. [¶] It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. [¶] Do not change your position just because it differs from that of other jurors, or just because you or others want to reach a verdict. Both the People and the defendant are entitled to an individual judgment of each juror. [¶] It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective. [¶] Let me know whether I can do anything to help you further, such as giv[ing] additional instructions or clarifying instructions that I have already given you. I want you to continue your deliberations at this time, and if you wish to communicate with me further, please do so in writing using the forms that we have provided. [¶] So that's the general instruction. But if you need further instructions or definitions of words — I tried to give you a definition of reasonable, which is just basically which you pull out of a dictionary. But if there is some other words that I can help you with, let me know. Or if there is something else that you think we can do, that might help. But you haven't been deliberating that long. And so I want you to go back in there and give it another try. And let me know what you come up with. And if you need something, just ask me." The jurors asked no questions, and defense counsel did not object to the court's handling of the issue.

Despite not objecting below defendant argues the trial court had a sua sponte duty to determine how to handle the deadlock, defense counsel did not have a meaningful opportunity to object, and the issue on appeal presents a pure question of law. The trial court satisfied its duty to determine how to approach the jury's note, and any objection to that determination was forfeited by not being raised in the trial court. The record reflects the trial court informed the prosecutor and defense counsel of the deadlock via conference call, and counsel were present when the court addressed the jury. Though

21

defendant argues the issue on appeal presents a purely legal question about ordering continued deliberations without any inquiry, had an objection been made the record could have been developed and the concern resolved in the trial court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["The purpose of this [forfeiture] rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected."].) As the issue was forfeited, we review the matter for ineffective assistance.

Contrary to defendant's argument that this case involved "lengthy deliberations in a single-issue case," the jury had deliberated for less than one full day and each of the two rape counts involved different and discrete elements (including K.D.'s level of intoxication and whether she was unconscious during the encounter). The trial court's supplemental direction to the jury, based on CALCRIM No. 3551, was framed as a series of suggestions, designed to ensure the jury did not feel coerced to reach a certain result. And though the jury initially informed the court there was no reasonable hope of reaching a unanimous verdict, the trial court was not bound by that view. (*Valdez, supra*, 55 Cal.4th at p. 159.) The Supreme Court has approved similar admonitions given after lengthier deliberations than those here. (*Id.* at p. 160 [16 hours]; *People v. Sandoval* (1992) 4 Cal.4th 155, 197 [14 hours].) The trial court acted within its discretion when it implicitly determined that unanimity remained a reasonable probability, even without seeking further information from the jury. Defense counsel was not ineffective for not objecting. (*People v. Ochoa, supra*, 19 Cal.4th at p. 463.)

### F. PENAL CODE SECTION 654

Defendant contends, and the People concede, that the sentence imposed for rape of an unconscious person must be stayed under section 654. In *People v. White* (2017) 2 Cal.5th 349, the Supreme Court decided that though a defendant can be convicted of both rape of an intoxicated person and rape of an unconscious person based on the same act, punishment for one count must be stayed under section 654. (*People v. White*, at

22

p. 352.)  We will modify the judgment to stay the sentence for rape of an unconscious person.

### G. CUMULATIVE PREJUDICE

Defendant claims that the errors he identifies are cumulatively prejudicial.  (See *People v. Hill* (1998) 17 Cal.4th 800, 844.)  As we have found only one error related to the trial phase of defendant's case (the trial court's improper, but not independently reversible, phrasing of a question to a defense psychologist), defendant's cumulative prejudice argument must fail.

## III.    DISPOSITION

The judgment is modified to stay the sentence for rape of an unconscious person (Pen. Code, § 261, subd. (a)(4)) under Penal Code section 654.  As so modified, the judgment is affirmed.  The clerk of the superior court is directed to enter and transmit to the Department of Corrections and Rehabilitation a new order and abstract of judgment reflecting that modification.

_____

Grover, J.

**WE CONCUR:**

_____

Greenwood, P. J.

_____

Danner, J.

H046864 - *The People v. Sta Ana*

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Case No.: C1761829 |
| Trial Judge: | Hon. Javier Alcala |
| Attorneys for Plaintiff/Respondent<br>The People: | XAVIER BECERRA<br>Attorney General of California<br>LANCE E.WINTERS<br>Chief Assistant Attorney General<br>JEFFREY M. LAURENCE<br>Senior Assistant Attorney General<br>ERIC D. SHARE<br>Supervising Deputy Attorney General<br>JOHN H. DEIST<br>Deputy Attorney General |
| Attorneys for Defendant/Appellant<br>Mark Jayson Sta Ana | MICHAEL C. SAMPSON<br><br>By Appointment of the Court of Appeal<br>Under the Sixth District Appellate Program |